UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

—————

DEONDRAE LAMAR SPARKMAN,

                Petitioner,                Case No. 1:12-cv-1007

v.                                         Honorable Paul L. Maloney

KENNETH McKEE,

                Respondent.

_____/

## OPINION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. On October 21, 2009, a Kent County Circuit Court jury convicted Petitioner of three offenses: first-degree felony murder in violation of MICH. COMP. LAWS § 750.316(b); assault with intent to rob while armed in violation of MICH. COMP. LAWS § 750.89; and felony firearm in violation of MICH. COMP. LAWS § 750.227b. On November 10, 2009, the trial court sentenced Petitioner as an habitual offender, third offense, Mich. Comp. Laws § 769.11, to life imprisonment without parole on the felony murder conviction, 50 years to 95 years on the assault conviction, and 2 years on the felony firearm conviction. The sentences for felony murder and assault were concurrent to each other and consecutive to the sentence for felony firearm.

In his *pro se* second amended petition (ECF No. 5) Petitioner raises five grounds for relief:

    I.        Did [Petitioner] receive ineffective assistance of counsel when his attorney failed to investigate or introduce records showing that [Petitioner] and Jermario Phillips communicated via telephone in the hours preceding the shooting, which

contradicted Phillips' claim that they were together and that he witnessed [Petitioner] participate in the shooting?

II.     Alternatively, did the prosecutor violate its duties under [*Brady v. Maryland*] by failing to disclose records showing that [Petitioner] and Jermario Phillips communicated via telephone in the hours preceding the shooting, which contradicted Phillips' claim that they were together and that he witnessed [Petitioner] participate in the shooting?

III.    Did the trial court deprive [Petitioner] of his due process right to a fair trial when it admitted a different set of telephone records despite the prosecution's discovery violation?

IV      Where [Petitioner] was compelled by the prosecution to testify pursuant to an investigative subpoena, was his testimony involuntary and did the use of the testimony against him for any purpose violate due process and his constitutional right against self-incrimination?

V.      Did the trial court violate [Petitioner's] due process rights by admitting photographs of the decedent[']s body where the danger of unfair prejudice due to the gruesomeness of the photograph substantially outweighed any probative value?

(ECF No. 5.) Respondent has filed an answer to the petition (ECF No. 11) and submitted the state-court record (ECF Nos. 13-27) as required under Rule 5, RULES GOVERNING §2254 CASES. Petitioner has submitted a response to Respondent's answer (ECF No. 36.) Upon review of the pleadings and the record, the Court will deny the petition for failure to raise a meritorious federal claim.

## **Procedural History**

### A.    **Trial Court Proceedings**

Petitioner's trial spanned several days during October of 2009, a little over two years after Timothy Dickens was murdered. In the early morning hours of October 6, 2007, Officer Timothy Hoornstra of the Grand Rapids Police Department was catching up on paperwork as he sat in his police

vehicle in the cemetery on the corner of Hall Street and Eastern Avenue. (Trial Tr. II, ECF No. 17, p. 71-73.)[1] Around 2:00 a.m., Officer Hoornstra heard an exchange of five to ten gunshots, then after a slight pause, two louder gunshots. (*Id*. at p. 73.) As he drove in the direction of the gunfire, he received a call from dispatch that a shooting had been reported near the intersection of Marshall Avenue and Oakdale Street, a block from the cemetery. (*Id*. at p. 75.)

When Officer Hoornstra arrived at the intersection, he discovered a Buick Regal, still running, in the roadway. (*Id*.) The driver's door had multiple bullet holes; the window was shattered. (*Id*.) The driver, Timothy Dickens, was slumped over and unresponsive. (*Id*. at pp.75-76.) Officer Hoornstra turned off the vehicle. (*Id*.) As he reached into the vehicle he observed a semi-automatic handgun, cocked and ready to fire. (*Id*. at p. 77.)

Unable to rouse Mr. Dickens, Officer Hoornstra and emergency medical personnel unbuckled him and removed him from the vehicle. (*Id*. at pp. 78, 90.) They discovered that Mr. Dickens had been shot through the left bicep. (*Id*. at p. 90.) Once he was in the ambulance, they discovered

---

[1]The Rule 5 materials submitted by Respondent include several transcripts that shall be referenced herein as follows:

| | |
|---|---|
| May 5, 21, 2009 Preliminary Examination Hearing | (Prelim. Exam. Tr., ECF No. 14, p. ___) |
| July 22, 2009 Status Conference Hearing Transcript | (Hr'g Tr., ECF No. 15, p. ___) |
| October 13, 2009 Trial Transcript  (Volume 1) | (Trial Tr. I, ECF No. 16, p. ___) |
| October 14, 2009 Trial Transcript  (Volume 2) | (Trial Tr. II, ECF No. 17, p. ___) |
| October 15, 2009 Trial Transcript  (Volume 3) | (Trial Tr. III, ECF No. 18, p. ___) |
| October 16, 2009 Trial Transcript  (Volume 4) | (Trial Tr. IV, ECF No. 19, p. ___) |
| October 19, 2009 Trial Transcript  (Volume 5) | (Trial Tr. V, ECF No. 21, p. ___) |
| October 20, 2009 Trial Transcript  (Volume 6) | (Trial Tr. VI, ECF No. 22, p. ___) |
| October 21, 2009 Trial Transcript  (Volume 7) | (Trial Tr. VII, ECF No. 23, p. ___) |
| November 10, 2009 Sentencing Transcript | (Sentencing Tr., ECF No. 24, p. ___) |
| November 1, 2010 New Trial Motion Hearing Transcript | (New Trial Hr'g Tr., ECF No. 25, p. ___). |

another gunshot wound to Mr. Dickens' head; at that point, they ceased resuscitation efforts and waited for the medical examiner to arrive.  (*Id*. at p. 91.)

The medical examiner, Dr. Stephen Cohle, examined Mr. Dickens.  (Trial Tr. III, ECF No. 18, p. 60.)  He opined that either gunshot wound would have resulted in Mr. Dickens' death.  (Id. at p. 70.)  He was not able to determine which wound occurred first.  (*Id*. at p. 65.)  Dr. Cohle concluded that the shot through Mr. Dickens arm had come from very close range, six inches or less.  (*Id*. at p. 64.)  Both wounds were caused by large caliber bullets.  (*Id*. at pp. 66-67.)

Examination of the victim's car revealed multiple bullet defects.  (Trial Tr. III, ECF No. 18, p. 93.)  Five bullets entered the driver's door, one perforated a tire rim, and one penetrated the rear bumper.  (*Id*. at pp. 94-100.)

Officers of the Grand Rapids Police Department established a perimeter and crime scene technicians began collecting and documenting evidence at the crime scene.  While working on the perimeter, Officer John Riley volunteered to respond to a dispatch call reporting that a gunshot victim had just arrived at the Blodgett Hospital Emergency Room.  (Trial Tr. III, ECF No. 18, pp.8-9.)  The victim, James Anthony Cross, had been shot on his right side.  (*Id*. at pp. 9-11.)  The bullet was still inside Mr. Cross, it was protruding under the skin near his left shoulder.  (*Id*.)  Officer Riley discovered that Mr. Cross had been transported to the hospital by Latisha Robinson in a white Chevrolet Blazer.  (*Id*.)  He inspected the vehicle, discovered what appeared to be a bullet hole and called for crime scene technicians to process the vehicle.  (*Id*. at p. 11.)

Investigation of the Blazer revealed an ammunition jacket and core inside the vehicle (*Id*. at p. 90) and several latent fingerprints (Trial Tr. II, ECF No. 17, pp. 148-50).  The fingerprints belonged

- 4 -

to, among others, James Anthony Cross, Jermario Phillips, and Marvin Lee Walton. (Trial Tr. III, ECF No. 18, p. 112.) There were no fingerprints that belonged to Petitioner in the Blazer. (*Id*. at p. 120.)

Marvin Lee Walton testified that he had been driving the white Blazer at the time Mr. Dickens was shot. (Trial Tr. IV, ECF No. 19, p. 71.) Three other men were with him: Jermario Phillips, James Anthony Cross, and Petitioner. (*Id*. at pp. 70-72.) Mr. Walton was driving down Marshall when one of his passengers told him to pull over. (*Id*. at p. 74.) Mr. Walton noticed a red car there. (*Id*.) James Anthony Cross and Petitioner exited the Blazer and headed toward the red car. (*Id*. at p. 75.) Mr. Walton heard gunshots; he pulled away. (*Id*. at pp. 75-76.) He stopped around the corner to check whether he had been hit. (*Id*.) As he was stopped there, James Anthony Cross and Petitioner returned to the Blazer. (*Id*. at p. 77.) Mr. Cross indicated that he had been shot. (*Id*.) Mr. Walton pulled away. (*Id*. at p. 78.) Shortly thereafter, Petitioner and Jermario Phillips exited the vehicle while it was stopped at a stop sign. (*Id*. at pp. 78, 104.) Mr. Walton continued, at Mr. Cross's direction, to the home of Latisha Robinson, Mr. Cross's girlfriend. (*Id*. at p. 79.) She joined Mr. Cross and Mr. Walton for the trip to Blodgett Hospital. (*Id*. at pp. 79-80.)

Mr. Walton claimed they did not stop to rob Mr. Dickens, only to buy marijuana. (*Id*. at p. 80.) He also indicated that he was not aware that Mr. Cross and Petitioner had guns until the shooting started. (*Id*.)

Jermario Phillips' version of the events was different than, and cannot be reconciled with, Mr. Walton's version. Mr. Phillips testified that the four men had seen Mr. Dickens and his vehicle earlier that night at the Elks bar. (*Id*. at pp. 116, 124-25.) Mr. Phillips testified that Petitioner had suggested that Mr. Dickens had marijuana and that they should "take his stuff." (*Id*. at pp. 125-26.) Mr. Phillips testified

- 5 -

that Mr. Cross and Petitioner had guns when they exited the white Blazer on Marshall Street; Mr. Cross had a .44 and Petitioner had a nine millimeter. (*Id*. at pp. 120, 122-23.) He testified that either Mr. Cross or Petitioner had "blooped[2]" them after the Blazer pulled away directing the Blazer to return for the gunmen. (*Id*. at p. 118.) Mr. Phillips testified that when he and Petitioner left the white Blazer after the shooting, Petitioner had the guns in his possession and that Petitioner took them to Mr. Phillips' stepfather's home where the group kept the guns for their use as needed. (*Id*. at pp. 120-21.)

Petitioner did not testify at his trial. But, the jury heard his description of the events of that night a couple of different ways. First, the jury heard the testimony of several jailhouse informants: Christopher Kimmell (Trial Tr. IV, ECF No. 19, pp. 38-48); Victor Thompson (*Id*. at pp. 50-67); and Damon Bradley (Trial Tr. VI, ECF No. 22, pp. 52-71).[3] Each testified that Petitioner had admitted his role in the murder of Mr. Dickens.

The jury also listened to Petitioner's version of events by way of an audio recording of Petitioner's November 29, 2007 investigative subpoena interview. (Interview Tr., ECF No. 26.)[4] During that interview, Petitioner informed investigators that he had been at the home of his girlfriend, Ms. Davonna

---

[2]At the hearing on Petitioner's motion for new trial, prosecutor Kellee Koncki testified that direct connect, two-way communications are usually free, or at least less expensive, than typical cellular calls. (New Trial Hr'g Tr., ECF No. 25, p. 29.) Mr. Phillips referred to such communications as "bloops," presumably because of the chirping sound the telephone makes to indicate an incoming communication.

[3]The jury also listened to two recorded interviews with then Kent County Jail inmate Jabari Abdullah. (Trial Tr. VI, ECF No. 22, pp. 22-25.) Jabari Abdullah had indicated to investigators that he had useful information and Victor Thompson testified that Abdullah was present during inculpatory conversations with Petitioner. In the first interview Abdullah corroborated basic information about the robbery and that Petitioner was involved in the shooting. (*Id*. at p. 22-23.) At the investigative subpoena interview, however, Abdullah claimed he made it up. (*Id*. at p. 24.) Neither the Abdullah recording nor a transcript of that recording appears in the Rule 5 materials submitted by Respondent.

[4]A transcription of the interview as it was played for the jury was not provided as part of the Rule 5 materials. The interview transcript is, nonetheless, part of the Rule 5 materials as an exhibit to Petitioner's brief filed in the Michigan Court of Appeals. (*See* appellate opinion and filings, ECF No. 26.)

Dobbs, the night Timothy Dickens was murdered. (*Id*. at pp. 14, 18-23.) Petitioner was adamant that there would be no activity on his cell phone after about 9:00 that night because he turned his phone off whenever he arrived at his girlfriend's house.[5]  (*Id*.)

The prosecutor elicited testimony from Craig Smith, a former Sprint Nextel employee, who had prepared the response to the prosecutor's subpoena regarding the cell phone records of Petitioner and his girlfriend. (Trial Tr. VI, ECF No. 22, pp. 36-50.) The records disclosed that Petitioner and his girlfriend had exchanged "bloops" at 2:25 a.m. and 3:14 a.m. shortly after Mr. Dickens was murdered. (*Id*. at pp. 43-45.) Moreover, the records demonstrated that Petitioner had initiated several "bloops" between 1:21 a.m. and 1:52 a.m.; but, there were no "bloop" attempts from 1:52 a.m. to 2:25 a.m., the window of time when the shootings occurred. (*Id*. at pp. 46-47. Ms. Dobbs confirmed that Petitioner would not have been with her if she was exchanging two-way communications with him. (Id. at pp. 79-80.)[6]

In closing, Petitioner's counsel invited the jury to look beyond the inconsistent and self-serving testimony of the jailhouse informants, Mr. Walton, and Mr. Phillips, to focus on the reliable physical evidence. There was physical evidence that put Mr. Walton, Mr. Phillips, and Mr. Cross at the scene of

---

[5]This was one of two recorded interviews the prosecutor sought to admit into evidence. The other interview occurred on October 10, 2007. (Trial Tr. IV, ECF No. 19, pp. 4-31.) Petitioner was brought in following a traffic stop because he was with Mr. Phillips and the police wanted to talk to Mr. Phillips. (*Id*,) The police discovered that Petitioner was a sex offender who had failed to register. (*Id*,) Detective Smith and Sergeant Terry McGee questioned Petitioner about his whereabouts on the night of the murder. (*Id*.) The trial court concluded this was a custodial interrogation and, because Petitioner had not been provided his *Miranda v. Arizona*, 384 U.S. 436 (1966) warnings, the interview could not be admitted into evidence. (*Id*. at pp. 29-31.)

[6]Although Ms. Dobbs ultimately acknowledged that Petitioner was not with her at the critical time, she had previously indicated otherwise to investigators. The prosecutor also played at least one recorded phone conversation between Petitioner and Dobbs wherein it seemed Petitioner was advising her what to say when she was questioned. (Trial Tr. VI, ECF No. 22, pp. 10-17.) Neither the recorded phone conversation nor a transcript of the conversation appears in the Rule 5 materials submitted by Respondent.

the crime, but there was no physical evidence that put Petitioner there.  The jury deliberated for less than four hours before finding Petitioner guilty.

## B.    Direct Appeal

Petitioner filed a claim of appeal in the Michigan Court of Appeals.  His brief, filed by counsel, raised the same issues he raises in his habeas petition.[7]  At the same time Petitioner filed his appeal brief, he also filed a motion to remand.  Petitioner sought remand to permit the trial court to consider a motion for new trial in light of the *Brady* violation and ineffective assistance issues that Petitioner had raised on appeal.  (Defendant-Appellant's Brief in Support of Mot. To Remand, ECF No. 26.)  The court of appeals granted the motion to remand, but retained jurisdiction.  (Sept. 3, 2010 Ord., ECF No. 26.)

On November 1, 2010, the trial court conducted a hearing on Petitioner's motion for new trial.  (New Trial Hr'g Tr., ECF No. 25.)  The court heard testimony from Petitioner's trial counsel, the prosecutor, and the lead investigator.  (*Id.*)  The controversy centered on phone records.

Early in the investigation of Mr. Dickens' murder, the investigators hoped to establish some connection between Mr. Dickens and Mr. Cross.  (*Id.* at pp. 18-19, 23.)  The compilation of phone records started there and expanded to hundreds of pages.  (*Id.* at p. 20.)  As the circle of participants grew the investigators obtained additional phone records.  (*Id.* at p. 18.)  By way of example, during an initial interview of Mr. Phillips, he provided a phone number.  (*Id.* at p. 51.)  Detective Les Smith then subpoenaed the records for that number.  (*Id.* at pp. 18-19, 50.)  That account, however, was held in a different name, Darius Crawford.  (*Id.* at pp. 18, 49.)  That left investigators in the difficult position of

---

[7]The brief identifies only four issues, but appellate brief issue I encompasses habeas petition issues I and II. (*Compare* Defendant Appellants' Brief on Appeal, ECF No. 26, p. v. and Amended Pet., ECF No. 5, PageID.111.)

trying to determine whether Mr. Phillips had lied when he provided the number to them or when he provided a name to cell provider at the time he opened the account. (*See Id.* at p. 28.) As additional numbers would come up, the picture became clearer. (*Id.* at p. 18.) At some point, Detective Smith concluded the Darius Crawford number indeed belonged to Mr. Phillips. (*Id.* at p. 32.) Detective Smith, therefore, on his digital compilation of the phone records, placed the Darius Crawford phone records in a file titled Jamario Phillips. (*Id.* at pp. 58-59.) Detective Smith testified that he provided the phone records to defense counsel on a disc that included that file with that title. (*Id.*)

Again, the key bit of information the investigators sought was some connection between Mr. Cross and his compatriots on the one hand and Mr. Dickens on the other. Because that connection never materialized, the prosecution did not focus on the phone records in preparing the case against Mr. Cross or Mr. Sparkman. During a pretrial discovery conference with counsel for Petitioner and Mr. Cross, the prosecutor made available all of the records she had. (*Id.* at pp. 8, 10, 21, 55-59.) But she also informed defense counsel that she did not intend to use the phone records at trial. (*Id.* at pp. 7-8, 13, 21.)

The prosecutor did not use the phone records at Mr. Cross's trial.[8] The prosecutor changed course after that trial. At that time she determined she could use the records to convincingly rebut Petitioner's story, as expressed in his investigative subpoena testimony and the testimony of Ms. Dobbs, that he was with Ms. Dobbs at the time of the murder. (*Id.* at pp. 24-27.) Petitioner's counsel objected

---

[8]Mr. Cross was convicted of assault with intent to rob while armed, felony murder, and felony firearm about a week before Petitioner's trial began.

based on the prosecutor's prior representations, but the trial court permitted use of the phone records at trial, as described above.  (*Id*. at pp. 8-9.)

    In his new trial motion, Petitioner contended that the prosecutor had either failed to provide the phone records to defense counsel or had misled counsel as to their content and significance.  Petitioner claimed the prosecutor's conduct with regard to the phone records prejudiced him in two ways: first, when the court overlooked it and permitted the prosecutor to introduce the "bloop" records regarding two-way communications between Petitioner and Ms. Dodds; and, second, when Petitioner was deprived of exculpatory evidence that appeared in those phone records.  Alternatively, to the extent the prosecutor had made the records available to Petitioner's counsel and he did not use them, or to the extent counsel had simply failed to investigate the issue of phone records without regard to the prosecutor's actions, Petitioner argued that his counsel was ineffective.

    The phone records that Petitioner claims are exculpatory are the "bloop" records of Mr. Phillips. (Defendant-Appellant's Brief on Appeal, App. A, ECF No. 26.) Those records show a two-way communication from Mr. Phillips to Petitioner at 1:52 a.m., within minutes of the murder of Mr. Dickens. (Id.) Petitioner argues that if the timing of his "bloops" with Ms. Dodds means they were not together, the timing of the "bloops" with Mr. Phillips must mean the same thing: that Mr. Phillips and Petitioner were not together just a few minutes before Mr. Dickens was murdered.  (Mot. for New Trial, ECF No. 25, pp. 60-63.) At a minimum, the records support the inference that the two might not have been together at a time that Mr. Phillips claims they were both in the same vehicle.

    The prosecution, on the other hand, argues that the "bloops" support the inference that the two were in communication immediately before the incident, perhaps in furtherance of the incident.  (*Id*.

at pp. 33-34, 44-45.)  The prosecution also pointed out that the events as described by the various participants do not preclude the possibility that the four men may not have been in the vehicle at the time of the "bloop," for example, they may have still been at the Elks Club, just a block away from the crime scene.  (*Id*.)

The trial court denied the motion for new trial.  The court concluded that whether the constitutional defect were characterized as a *Brady* violation or ineffective assistance, Petitioner had failed to demonstrate that the result would have been any different.  The trial court went so far as to say that the evidence was "probably . . . as beneficial to the prosecution as it would have been to the defense . . . ." (New Trial Hr'g Tr., ECF No. 25, p. 87.)

The court of appeals agreed with the trial court with regard to the *Brady* violation/ineffective assistance issues.  (Mich. Ct. of Appeals Op., ECF No. 26, pp. 2-3.)  It concluded that Petitioner's investigative subpoena testimony was admissible even if it was incriminating because it was neither forced nor compulsory.  (*Id*. at pp. 4-5.)  With respect to the autopsy photos the court concluded that they would not have an undue tendency to influence the jury to decide the case on an improper basis. *Id*. at pp. 5-6.)  The court of appeals affirmed the convictions and sentences by unpublished opinion dated June 23, 2011.

Petitioner filed an application for leave to appeal, with the assistance of counsel, in the Michigan Supreme Court.  That court denied leave by order entered November 21, 2011.  (Mich. Ord., ECF No. 27.)  Petitioner commenced this action by filing a pro per petition in September of 2012.

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655.  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 132 S. Ct. 38 (2011).  Thus, the inquiry is

limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### A.    *Brady* violation

Under *Brady v. Maryland*, 373 U.S. 83 (1963), "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.  The Supreme Court has held that "[t]here are three components of a true *Brady* violation:  [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  Prejudice (and materiality) is established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 281 (quoting *Bagley*, 473 U.S. at 682); *see also Cone v. Bell*, *Cone v. Bell*, 556 U.S. 449, 469-70 (2009).  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

The Michigan Court of Appeals reviewed Petitioner's claim of prosecutorial misconduct under the *Brady* standards:

> Prosecutors have a duty to disclose evidence that is "material either to guilt or to punishment."  To establish that a prosecutor has engaged in misconduct by failing to disclose exculpatory evidence, a defendant is required to show (1) the state possessed evidence favorable to him; (2) he neither possessed the evidence nor could have obtained the evidence through reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) a reasonable probability that the result of his trial would have been different had the prosecution disclosed the evidence.  Sparkman is unable to meet these requirements.
>
> At the outset, we note that the prosecutor did not suppress Phillips's telephone records, as the records were made available to defense counsel before trial initiated.  The

prosecutor's lack of awareness that the voluminous telephone records contained potentially exculpatory evidence did not constitute misconduct as a prosecutor is not required to "seek and find" exculpatory evidence. In addition, defense counsel could have obtained Phillips's telephone records through reasonable diligence. Even if we were to characterize the prosecutor's indication to defense counsel that she did not believe that the Phillips' telephone records had any inherent evidentiary value as a form of suppression, Sparkman has failed to demonstrate a reasonable probability that the result of the proceedings would have been different had he introduced the records at trial. The record of Phillips' telephone call to Sparkman 17 minutes before the shooting would have been of minimal value to establish that Sparkman was not present with Phillips at the scene of the shooting as it is not uncommon for people to communicate over a two-way direct connect telephone feature while in close physical proximity. Similarly, given the strong evidence provided by two witnesses placing Sparkman at the scene of the shooting and three additional witnesses testifying to statements he made indicating his involvement in the murder, Sparkman is unable to demonstrate that the evidence would have altered the result of the proceeding.

(Mich. Ct. of Appeals Op., ECF No. 26, p. 2 (footnotes omitted).) The court of appeals consideration of the *Brady* issue appears to be consistent with, and not contrary to, clearly established federal law. Moreover, the court's determination that the phone records would not have been likely to change the result appears to be eminently reasonable. Petitioner has failed to demonstrate that the court's application of the law or determination of the underlying facts was unreasonable; accordingly, his *Brady* violation claim is without merit.

### B. Ineffective assistance of counsel.

Perhaps anticipating that the prosecutor's conduct might not rise to the level of a *Brady* violation, Petitioner argues in the alternative that his counsel rendered ineffective assistance by failing to investigate or use the phone records. The same lack of prejudice that precludes finding a *Brady* violation, however, also precludes finding ineffective assistance of counsel.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish

a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. "When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

The Michigan Court of Appeals expressly relied on *Strickland* in resolving Petitioner's claim:

> We also reject Sparkman's related argument of ineffective assistance of counsel because his attorney failed to investigate Phillips's telephone records. Whether a defendant was denied the effective assistance of counsel presents a mixed question of constitutional law and fact. To prevail on his claim of ineffective assistance of counsel, Sparkman must meet the two-part test as elucidated by the United States Supreme Court.

> First, Sparkman must show that his counsel's performance "fell below an objective standard of reasonableness" under prevailing professional norms and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Sparkman is unable to establish the second requirement of this test. The record of Phillips' telephone call to Sparkman shortly before the shooting was of minimal exculpatory value. While defense counsel could have argued that the telephone record indicated that Sparkman was not with Phillips, Marvin Walton, and James Cross at the time of the murder, the record equally supports the alternative argument that Phillips placed the two-way direct connect call to Sparkman just before the murder while both were at a local club trying to effectuate a drug transaction. When viewed in conjunction with the strong evidence of Sparkman's guilt, it is unlikely that pursuit of this theory by defense counsel would have resulted in a different verdict.

(Mich. Ct. of Appeals Op., ECF No. 26, pp. 2-3 (footnotes omitted).)  On its face, the court of appeals analysis is consistent with, not contrary to, clearly established federal law.  Petitioner has certainly failed to show that the court's application of that law or its determination of the facts is unreasonable.  Petitioner's ineffective assistance of counsel claim is, therefore, without merit.   **C.   Admission of evidence**

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68.  State court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000)

(quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). Petitioner challenges the admission of three categories of evidence: the phone records, his investigative subpoena testimony, and three photos from the autopsy of Mr. Dickens. Petitioner has not met this difficult standard with respect to any of his challenges.

### 1.     Phone records

Petitioner complains that admission of the phone records was improper because the prosecutor's conduct with regard to those records violated *Brady* and the Michigan Court Rules regarding discovery in a criminal case. The court of appeals rejected both propositions:

> Next, Sparkman asserts that the trial court erred and deprived him of a fair trial when it admitted into evidence records of his telephone calls to Davonna Dobbs after the prosecution failed to disclose the records. We review a trial court's decision to admit evidence for an abuse of discretion and its findings of fact for clear error. We review constitutional issues de novo.
>
> "[D]iscovery in criminal cases is constrained by the limitations expressly set forth in . . . MCR 6.201." In accordance with the court rules, "a party upon request must provide all other parties . . . a description of and an opportunity to inspect any tangible physical evidence that the party may introduce at trial, including any document . . . or other paper, with copies to be provided upon request." We find that the prosecutor did not

violate the relevant court rule.  First and foremost, "[t]here is no general constitutional right to discovery in a criminal case."  Second, the prosecutor provided defense counsel with the opportunity to inspect and copy the telephone records, which included a listing of the telephone calls between Sparkman and Dobbs.  Based on the availability of the records to counsel, the trial court did not abuse its discretion when it admitted into evidence the records consisting of the telephone calls from Sparkman to Dobbs.

(Mich. Ct. of Appeals Op., ECF No. 26, pp. 3-4 (footnotes omitted).)[9]  To the extent Petitioner relies on a *Brady* violation to render the evidence inadmissible, the court of appeals' reasonable determination that there was no *Brady* violation ends the analysis.

To the extent Petitioner relies on a violation of the Michigan Court Rules, the same result follows because the court of appeals similarly concluded there was no violation of the state court rules.  It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle*, 502 U.S. at 68.  The decision of the state courts on a state-law issue is binding on a federal court.  *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983). The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76). Petitioner has failed to identify any error, much less an error of constitutional dimension, with regard to the admission of the phone records.

## 2.    Investigative subpoena testimony

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."  Petitioner complains that the admission of

---

[9]The court of appeals went on to determine that even if the trial court had admitted the evidence in error, the error was harmless.  (Mich. Ct. of Appeals Op., ECF No. 26, p. 4 (footnotes omitted).)

his investigative subpoena interview violated that Fifth Amendment right by effectively forcing him to be a

witness against himself.  The Michigan Court of Appeals disagreed:

> Sparkman also raises an issue contending that the admission of his investigative subpoena testimony violated his constitutional rights against compulsory self-incrimination and due process.  We review the trial court's decision to admit the investigative subpoena testimony for an abuse of discretion and constitutional issues de novo.  The United States and Michigan Constitutions protect a person from compulsory self-incrimination and deprivations of life, liberty, or property without due process of law.  The relevant statute provides, "[a] person properly served with an investigative subpoena . . . shall appear before [a] prosecuting attorney and answer questions concerning the felony being investigated . . . ."  In addition, "[a]ny person may have legal counsel present in the room in which the inquiry is held" and mandates  that a prosecutor "shall inform the person of his or her constitutional rights regarding compulsory self-incrimination before asking any questions under an investigative subpoena," unless the person subject to the investigation is granted immunity.
>
> *     *     *
>
> [W]e find that the trial court neither abused its discretion nor violated Sparkman's constitutional rights by admitting his investigative subpoena testimony into evidence.  Sparkman's investigative subpoena testimony was not incriminating as he simply denied any involvement in the murder nor did his testimony lead to the disclosure of incriminating evidence or "furnish a link in the chain of evidence needed to prosecute."  Even if we were to find the investigative subpoena testimony to be incriminating, Sparkman is unable to demonstrate that it was "forced" or compulsory.  Sparkman was informed of his right to have an attorney present and of his right to refuse to provide incriminating responses.  Sparkman was free to object to any question or refuse to answer.

(Mich. Ct. of Appeals Op., ECF No. 26, pp. 4-5 (footnotes omitted).)

A statement that is made voluntarily after appropriate warnings does not violate the Fifth

Amendment's protection.  *Oregon v. Elstad*, 470 U.S. 298, 304-09 (1985).  That begs the question,

however, as to what warnings are appropriate in the context of an investigative subpoena.

It does not appear that the *Miranda* warnings were required.  As the Sixth Circuit noted in *United*

*States v. Radabaugh*, No. 86-3459, 1988 WL 12801 (6th Cir. Feb 22, 1988), "*Miranda . . .* applies

- 20 -

to custodial interrogation . . .[;] the argument that mere service of a subpoena and initiation of questioning by a government agent constitute custodial interrogation is untenable."[10]  Similarly, the fact that Petitioner was incarcerated at the Kent County jail did not render him "in custody" for purposes of *Miranda* warnings.  The Supreme Court conclusively rejected that proposition in *Howes v. Fields*, 132 S. Ct. 1181 (2012):

> [I]mprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*  There are at least three strong grounds for this conclusion.  First, questioning a person who is already serving a prison term does not generally involve the shock that very often accompanies arrest.  In the paradigmatic *Miranda* situation—a person is arrested in his home or on the street and whisked to a police station for questioning—detention represents a sharp and ominous change, and the shock may give rise to coercive pressures.  A person who is "cut off from his normal life and companions," *[Maryland v.] Shatzer*, 130 S.Ct., at 1220, and abruptly transported from the street into a "police-dominated atmosphere," *Miranda*, 384 U.S. at 456, may feel coerced into answering questions.

> By contrast, when a person who is already serving a term of imprisonment is questioned, there is usually no such change.  "Interrogated suspects who have previously been convicted of crime live in prison."  *Shatzer*, 130 S.Ct., at 1224.  For a person serving a term of incarceration, we reasoned in *Shatzer*, the ordinary restrictions of prison life, while no doubt unpleasant, are expected and familiar and thus do not involve the same "inherently compelling pressures" that are often present when a suspect is yanked from familiar surroundings in the outside world and subjected to interrogation in a police station.  *Id.*, 130 S.Ct. at 1219.

> Second, a prisoner, unlike a person who has not been sentenced to a term of incarceration, is unlikely to be lured into speaking by a longing for prompt release.  When

---

[10]*See also Minnesota v. Murphy*, 465 U.S. 420, 431-432 (1984) (holding that power to probation officer to compel attendance and truthful answer to interview questions did not render the setting coercive or custodial and noting that the Court had never held that Miranda warnings must be given to grand jury witnesses); *United States v. Mandujano*, 425 U.S. 564, 580-581 (1976) (holding that it is incorrect to expand *Miranda* to grand jury subpoena circumstance, particularly the right to decline to answer any question); and *Stanley v. United States*, 245 F.2d 427, 434-435 (6th Cir. 1957) (pre-*Miranda*, the court concluded that a grand jury investigative subpoena was not coercive and if the witness was asked questions that tended to incriminate him, it was his duty to claim the privilege and refuse to testify).  Certainly a grand jury subpoena and the investigative subpoena in Petitioner's case are different, but the nature of the compulsion and, thus, its coercive effect, are the same.

a person is arrested and taken to a station house for interrogation, the person who is questioned may be pressured to speak by the hope that, after doing so, he will be allowed to leave and go home. On the other hand, when a prisoner is questioned, he knows that when the questioning ceases, he will remain under confinement. *Id.*, S.Ct. at 1224–1225, n. 8.

Third, a prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence. *Id.*, 130 S.Ct., at 1224–1225. And "where the possibility of parole exists," the interrogating officers probably also lack the power to bring about an early release. *Ibid.* "When the suspect has no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his listeners." *[Illinois v.] Perkins*, 496 U.S. at 297. Under such circumstances, there is little "basis for the assumption that a suspect ... will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of [a] more lenient treatment should he confess." *Id.*, at 296–297.

In short, standard conditions of confinement and associated restrictions on freedom will not necessarily implicate the same interests that the Court sought to protect when it afforded special safeguards to persons subjected to custodial interrogation. Thus, service of a term of imprisonment, without more, is not enough to constitute *Miranda* custody.

*Howes*, 132 S. Ct. at 1190-1191 (parallel citations omitted).

Because *Miranda* does not apply, there was no requirement for the prosecutor to warn Petitioner that he had the right to remain silent. That is the *Miranda* warning that the prosecutor did not provide. The prosecutor warned Petitioner that his statements could be used against him, that he had the right not to answer if the answer would incriminate him, and that he had the right to counsel. (Defendant-Appellant's Brief on App., Appendix B, ECF No. 26, p. 4.) Because Petitioner made his statements voluntarily after those warnings, the use of the statements would not run afoul of Fifth Amendment protections.

The Michigan Court of Appeals' determination that Petitioner's statement after the warnings was not compelled, but voluntary, is consistent with clearly established federal law. The state court's

- 22 -

application of that law and its determination of the underlying facts was not unreasonable.  Accordingly,

Petitioner is not entitled to habeas relief on his Fifth Amendment claim.          **3.      Autopsy**

**photos**

Petitioner contends that three photographs taken by the medical examiner should not have

been admitted into evidence because they were too inflammatory and, thus, unduly prejudicial.  The

Michigan Court of Appeals rejected the claim:

> Finally, Sparkman contends the trial court erred in permitting highly prejudicial autopsy photographs to be introduced into evidence.  "The decision to admit or exclude photographs is within the sole discretion of the trial court."  A trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice. . . ."  Evidence is not unfairly prejudicial merely because it is found to be damaging to a party's case.  The term "unfair prejudice" has been defined to mean "an undue tendency to move the tribunal to decide on an improper basis . . . an emotional one"

> We find that the trial court did not abuse its discretion when it admitted the three autopsy photographs into evidence.  As with any such evidence, although the photographs were graphic, they did not have an undue tendency to influence the jury to decide the case on an improper basis.  The pathologist referred to the photographs during his testimony to explain the nature and extent of the victim's injuries.  Such evidence was probative with regard to the issue of Sparkman's intent to rob the victim, as the photographs helped illustrate the size and locations of the victim's bullet wounds, the paths of the bullets and the range of firing.  We specifically reject the argument posited by Sparkman that the autopsy photographs were inadmissible because the pathologist could explain his opinion solely on the basis of the autopsy as  photographs may be used to corroborate a witness's testimony and "are not excludible simply because a witness can orally testify about the information contained in the photographs."

(Mich. Ct. of Appeals Op., ECF No. 26, pp. 5-6 (footnotes omitted).)  To the extent the court of appeals

opinion resolves the issue as a matter of state evidentiary law, that determination is binding on this Court.

*Wainwright*, 464 U.S. at 84.

With respect to constitutional propriety, Petitioner has failed to demonstrate that the court of appeals' resolution is contrary to, or an unreasonable application of, clearly established federal law. Indeed, The Sixth Circuit repeatedly has held that the introduction of gruesome photographs of a victim's corpse in a murder case does not offend the Constitution when there is some legitimate evidentiary purpose for demonstrating the nature of the injuries. *See, e.g., Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005) ("The [state] court found, however, that the photographs were properly admitted as they demonstrated that Biros beat Engstrom rather severely and meticulously dissected her body with two different knives."); *Frazier v. Huffman*, 343 F.3d 780, 789 (6th Cir. 2003) ("The Ohio Supreme Court directly addressed this evidentiary issue, concluding that the multiple photographs 'were introduced during the coroner's testimony to illustrate the testimony,' that '[e]ach photograph presents a different perspective of the victim,' and that the photographs 'were used to illustrate' the nature of the encounter that immediately preceded Skiba's death.") (citation omitted); *Cooey v. Coyle*, 289 F.3d 882, 893 (6th Cir. 2002) (observing that "although the photographs were gruesome, they were highly probative"). The photographs were relevant to illustrating trial testimony regarding the victim's injuries. Moreover, the photographs in this case were less inflammatory than in *Biros*, where the Sixth Circuit upheld the admission of photographs depicting a victim's severed head, severed breast, and severed body parts placed near the victim's torso. *See Biros*, 422 F.2d at 391. Accordingly, Petitioner cannot establish a due process violation arising from admission of the photographs.

## Conclusion

In light of the foregoing, the Court will deny Petitioner's application because it fails to raise a meritorious federal claim.

## **Certificate of Appealability**

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's denial of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.

Dated:  August 26, 2016                         /s/ Paul L. Maloney
                                                Paul L. Maloney
                                                United States District Judge